UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RODRIGO CAMPOSANO,

       Movant,

vs.

                     CASE NO._____
                     (Crim. 3:01-520-02-CCC)

UNITED STATES OF AMERICA,

       Respondent.

_____/

**MOTION TO VACATE, SET ASIDE, AND/OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255; AND REQUEST FOR
AN EVIDENTIARY HEARING**

     COMES NOW the Movant, RODRIGO CAMPOSANO, pro se, hereby moves
this Honorable Court to vacate, set aside, and/or correct sentence
pursuant to 28 U.S.C. § 2255, based upon the foregoing grounds:

PRELIMINARY STATEMENT

     **Jurisdiction.** The jurisdiction of this Court is properly invoked
pursuant to 28 U.S.C. § 2255. Movant's direct appeal was affirmed
in part and vacated in part on August 17, 2005.

     Movant's second direct appeal was affirmed on February 13,
2009. Certiorari to the United States Supreme Court concluded on
June 2009. Consequently, Movant has up until June 2010 to have
timely filed the foregoing motion to vacate.

## STATEMENT OF THE CASE AND FACTS

On July 24, 2001, the Movant, Rodrigo Camposano, along with codefendants Jaime Pinillos and Nolgie Rodriguez-Zamot, were charged by way of indictment with two counts of conspiracy and attempt to possess with intent to distribute cocaine, all in violation of 21 U.S.C. § 846. (DE 10).

On October 17, 2002, trial by jury commenced in this case and continued until October 25, 2002, at which time the jury returned a verdict of guilty as to both counts of the indictment. (DE 173).

On March 28, 2003, Camposano was sentenced to 235 months of impriaonment as to each count to run concurrently. (DE 225 & 245).

On August 17, 2005, the U.S. Court of Appeals affirmed his conviction, but vacated and remanded for resentencing in light of U.S. v. Booker, 543 U.S. 220 (2005). See U.S. v. Pinillos, et-al, 419 F.3d 61 (1st Cir. 2005).

On May 9, 2007, the court resentenced Camposano to the same sentence of 235 months previously imposed. On February 13, 2009, the Court of Appeals affirmed Camposano's resentence. See U.S. v. Camposano, 556 F.3d 36 (1st Cir. 2009).

However, in so doing, the Court of Appeals expressed its doubts as to "how much Camposano was shown to have known" as to the drug transaction. Nonetheless, because Camposano's counsel failed to raise the issue at sentencing or on appeal, the Court held that it was "not disposed to overturn a sentence on a ground raised neither at sentencing or on appeal." Id. at 556 F.3d at 40. (Emphasis added).

## BACKGROUND

Movant Rodrigo Camposano, co-defendant Jaime Pinillos, and co-defendant Nolgie Rodriguez-Zamot, were the defendants at trial. The Government's proof at trial was based entirely on the testimony of two confidential informants, Nelson "Rafa" Rodriguez and Nataya "Princesa" Posada, and an undercover agent, Toro Zambrana of the Puerto Rico Department of Justice.

This "reverse sting" case began in Colombia, S.A. when co-defendant Jaime Pinillos met CI Rafa in early 2001. Pinillos had informed CI Rafa that he was solving a problem of several computers which had been seized in Colombia. (DE 281 at 132-133). In this meeting, CI Rafa represented himself as a drug trafficker. Pinillos, in turn, represented himself as a facilitator of sorts who had access to potential cocaine buyers in the United States and the ability to launder drug money by using it to buy computers, which could then be imported legally into Colombia and sold. United States v. Pinillos, et al., 419 F.3d 61, 63-64 (1st Cir. 2005).

Pinillos provided a telephone number of a cousin in Miami for CI Rafa to contact. (DE 281 at 132-133). Subsequent to the meeting in Colombia, CI Rafa called Pinillos's cousin in Miami and talked to him, but they never met. (Id.). There was no testimony as to the content or nature of this telephone conversation. There was also a meeting between CI Rafa and Pinillos in Miami, but there was no testimony as to the content or nature of this meeting. And it was not recorded.

3

On July 5, 2001, Pinillos telephoned CI Rafa (who was in Puerto Rico at the time) from Miami and said that he had a customer to buy 100 computers. CI Rafa asked Pinillos if the customer had the money -- approximately $ 1.4 million, since the going rate was about $13,500 per kilogram. Pinillos confirmed that the buyer had the money. During this telephone call, as in other communications, CI Rafa and Pinillos did not use the terms "cocaine" or "kilos," but rather the terms "laptop" and "computers," which CI Rafa later testified, were code words designed to obscure their conversation in case law enforcement overheard them. Id. 419 F.3d at 64.

At this juncture, CI Rafa contacted his case agent at the Drug Enforcement Administration, who authorized him to proceed with a "reverse sting" operation. In a classic sting, Government agents attempt to buy drugs from persons suspected of being drug sellers. In a reverse sting, Government agents offer to sell drugs to persons suspected of being drug buyers. Id. 419 F.3d at 64.

In this reverse sting, CI Rafa would be part of a three-person team of "sellers," and would serve as the negotiator and principal liaison to the buyers. CI Nataya "Princesa" Posada, a Colombian national and occasional Government informant, would pose as the owner of the drugs, Special Agent Anthony Toro-Zambrana ("Toro") of the Special Investigations Bureau of the Puerto Rico Department of Justice, an undercover narcotices agent, would pose as Princesa's bodyguard and, as a Puerto Rican, one who was familiar with Pueto Rico and could arrange certain logistics.

4

On July 6, 2001, CI Rafa and Pinillos had a phone conversation where they scheduled a meeting in Isla Verde, Puerto Rico for July 9, 2001. Because Pinillos did not have any money to pay for travel expenses, Pinillos asked Camposano to loan him $2,000 and in return for the loan he would pay for his trip to Puerto Rico to accompany him and enjoy a mini vacation. Pinillos also promised to pay back the money as soon as he sold the computers that he was going to buy from a business associate, CI Rafa. At no time did Pinillos inform Camposano that the real reason for going to Puerto Rico was to consumate a drug transaction.

Camposano agreed to loan Pinillos the money but only if he would immediately repay it since that money had been set aside by Camposano and his common law wife to pay for his monthly expenses for his home and business. Camposano had a gardening and lawn cutting business. Pinillos agreed in the presence of his common law wife and Camposano's employee, who would remain in charge while Camposano went to Puerto Rico. Pinillos and Camposano then went and bought the plane tickets with a return date. And Camposano had his common law wife pack him a suitcase with clothes and a camera.

On July 9, 2001, the scheduled meeting took place at the Espana Bakery in Isle Verde, Puerto Rico. (DE 280 at 34-36). When CIs Rafa and Princesa, and agent Toro arrived at the bakery, Pinillos was already there sitting in a table with Nolgie-Rodriguez and Camposano. After CIs Rafa and Princesa, and agent Toro were seated at a table, they were approached by Pinillos who had left the other table where he had been sitting with Rodriguez-Zamot and Camposano. (De 280 at 35). The subsequent conversation was videotaped from outside the bakery, but no sound was recorded. (DE 280 at 43-45).

5

After initial introductions, Pinillos assured CI Rafa and CI Princesa that he had the $700,000 ready for the purchase and the balance would be paid in New York. However, he stated that the buyers wanted first to buy one kilo and test its quality before committing to a larger purchase. CI Rafa and CI Princesa refused, saying they were there for a multi-kilo deal. CI Princesa pointed out that the cocaine was traded wholesale in 25-kilo packages, and she would not open up a package just to extract one. CI Rafa further noted that Pinillos's proposal was not in the buyers' interests, since the sellers could easily provide a high-quality test kilo and then sell them 99 low-quality kilos. CI Rafa suggested instead that the buyers purchase an entire 25-kilo package, and the buyers could test one kilo from the package while remaining assured that the other 24 kilos were of equal quality. Id. 419 F.3d 64-65.

Pinillos then went back to the table were Rodriguez-Zamot and Camposano were sitting, at this juncture CI Rafa and CI Princesa, nore agent Toro, had met Rodriguez-Zamot and Camposano. Pinillos shortly returned and related that he rejected the 25-kilo proposal because that type of deal was how undercover police agents did business. CI Rafa and CI Princesa then refused and made a counter-offer, but Pinillos rejected it. (DE 265 at 25-28, 33).

Rodriguez-Zamot and Camposano then abruptly left the bakery. But Pinillos and CI Rafa followed them outside; agent Toro and CI Princesa remained behind. Outside the restuarnat there was an attempt by CI Rafa to set up an agreement with Pinillos to secure the transaction, but they could not agree. Instead. Pinillos and CI Rafa agreed to meet later that afternnon to continue talking.

6

None of these conversations were recorded. And Rodriguez-Zamot and Camposano were not part of this conversation. Nor was Camposano part of any conversation inside the restaurant, or privy to what the CIs and Pinillo were discussing inside or outside the restaurant. There is no recording were Camposano's voice is heard, nor any testimony from the CIs or the government agent that allege that Camposano had anything to do with the negotiations.

At a meeting later that day, CI Rafa and agent Toro met with Pinillos, more negotiations took place, yet again no agreement was reached. (DE 265 at 38, 42-43). And although Camposano was present, again he was not privy to what the negotiations were about.

Finally, the government witnesses testified that an agreement was reached. The transaction would involve two cars. First, Campo-sano would drive a car containing the money to the handoff site. After CI Rafa counted the money, the buyers would drive the car offsite. Then CI Rafa would signal for a car contining the drugs to come to the site. Campusano would drive that car away, leaving Pinillos with CI Rafa and agent Toro as a guarantee, i.e. hostage. Once the buyers had verified the quantity and quality of the drugs, they would return with the "mony" car; CI Rafa and agent Toro would take the money and Pinillos would be released. Pinillos and CI Rafa later agreed that this transaction would take place on July 11, 2001 at the parking lot of the Metropol Restaurant.

At the appointed time, CI Rafa and agent Toro arrived in the parking lot and waited. Then Pinillos arrived and they waited for Camposano to arrive in the "money" car. Pinillos appeared somewhat

nervous but assured CI Rafa and agent Toro that everything was in order -- he had seen the money, and the buyers were not planning to rob them. CI Rafa sensed that something was not right and asked Pinillos to call Camposano, but Pinillos replied that Camposano would not be available by telephone. CI Rafa then asked whether the buyers were going to pay for one kilo or 25 kilos. Pinillos did not answer. Both CI rafa and agent Toro grew concerned that the trans-action was not proceeding as planned and that their lives might be at risk. Id. 419 F.3d at 66.

But, finally, Camposano arrive at the parking lot on foot. Contrary to the exchange that was supposed to take place, there was no money or cocaine brought to this meeting. However, because agent Toro decided that this was a bad sign, i.e. Camposano arrived at the parking lot on foot, rather than in the "money" car as CI Rafa and Pinillos had supposedly agreed, he called nearby agents who arrested Pinillos and Camposano. Rodriguez-Zamot was later arrested. No drugs, money, or weapons were ever found on or near any of the defendants. Id. 419 F.3d at 66.

On July 24, 2001, a grand jury retruned a two-count indictment against Pinillos, Camposano, and Rodriguez-Zamot. Count One charged that defendants conspired to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 846. And Count Two charged that defendants aided and abetting each other, attempted to possess with intent to distribute five or more kilo-grams of cocaine, in violation of 18 U.S.C. § 2(a) and 21 U.S.C. § 841(a)(1).

## PRIOR TO TRIAL

On October 2, 2001, a meeting of all codefendants and their
attorneys was held at MDC Guaynabo. The attorneys had agreed to
meet in order to determine if there were possible common defense
for trial. All the conversations were voluntary and it started out
chronologically, with codefendant Jaime Pinillos narrative were he
explained what was his business in Colombia; how he met the confi-
dential informant; and, what was their relationship.

During the meeting, Pinillos specifically volunteered to
Camposano's attorney, Ms. Lydia Lizarribal, Camposano, codefendant
Nolgie Rodriguez-Samo, and Rodriguez-Samo's attorney, Mr. Jose C.
Romo Matienzo, that he wanted to testify on behalf of Camposano
and Rodriguez-Samo because they were both innocent. Specifically,
Pinillos stated that Camposano and Rodriguez did not have anything
to do with the charges filed against them.

Further, that he had lied to Camposano about the reason why
he needed the $2,000 loan. That the purpose of his trip was not to
do a lawful business transaction, but to attempt to purchase drugs.
That he was sorry to have lied to him about the reason for coming
to Puerto Rico.

In the presence of Camposano's attorney, Pinillos stated that
he Pinillos was guilty and Camposano was innocent. He insisted that
he wanted to testify on behalf of Camposano. See Joint Motion Re-
questing Severance (DE:112) at 3, ¶ 12.

9

"Mr. Pinillos also expressed his desire to speak with the prosecutor about his knowledge of the charges and in order to explain that Messrs. CAMPOSANO and RODRIGUEZ-SAMO were not involved in the instant offense." Id. at 3 ¶ 13.

Based upon the exculpatory nature of Mr. Pinillos testimony, Camposano's attorney filed a joint motion requesting severance for Campusano and Rodriguez-Samo. Specifically, counsel stated that a severance was needed because there was a "need for Mr. PINILLOS' testimony," because "Mr. Pinillos' testimony would be 'substantially exculpatory.'" Id. at 4.

Immediately thereafter, however, Mr. Pinillos' attorney, Ms. Plaza filed a motion in opposition to severance and to exclude co-defendant Pinillos's statements made during codefendants' meeting. Ms. Plaza argued against severance on the basis that Mr. Pinillos' statements were somehow protected based upon confidentiality since they were given during a codefendants' meeting to determine if there was "a possible common defense for trial." Motion in Opposition at 2-3. Additionally, Ms. Plaza argued that because Mr. Pinillo would testify as to his innocence at trial, he would automatically be "exculpating" Campusano and Rodriguez-Samo, thus, "there would be no need to bring the alleged statement given [by Pinillo] during the co-defendants' meeting." Id. at 4.

On September 9, 2002, the Court denied the joint motion for severance. In so doing, the Court held that any "incriminating" statement made by Pinillo during the meeting constituted a "privileged communication that is inadmissable at trial against Pinillos." (DE:125).

10

### Plea Offer

In the time being, prior to the Court ruling on the severance motion, the Government extended plea offers to Nolgie-Rodriguez and Camposano. These offers were made based on the evidence supplied by the undercover agents who participated at the meetings, and based upon the exculpatory nature of Pinillos statements made at the codefendants meeting.

The plea offer made to Camposano was for an offense level of 32, -3 points for acceptance of responsibility, -2 points for safety valve, and -4 points for minimal participation. For a total offense level of BOL 23, which proscribes a guideline sentencing range of 46 - 57 months.

### Preparation of Defense

Ms. Lizarribar, however, knowing that Camposano was completely innocent continued to press the Court to authorize her to retain an investigator in order to adequately investigate and prepare a defense for Camposano. The Court had denied her first motion and she, thus, submitted a motion for reconsideration which also was denied.

Based on the denial, no witnesses were ever interviewed for Camposano's defense, no investigation was conducted, no evidence secured, no expert witnesses, no character witnesses, no defense witnesses were called or subpoened.

11

THE DEFENSE

Jaime Pinillos

All three defendants testified on their own behalf.

Contrary to the statements he made at the October 2, 2001, codefendants' meeting, Pinillos testified that he was innocent. Specifically, Pinillos testified that he resided in Colombia and that for the past seven years had been working in computers. (DE 267 at pg. 38). He met CI Rodriguez in Colombia in mid October of 2000, at which time they discussed the possibility of CI Rodriguez giving Pinillos credit to purchase computers to be exported and sold in Colombia. (DE 267 at pgs. 42-43).

Pinillos stated that he knew CI Nelson Rodriguez in Colombia as Carlos Parra and that "Parra" had contacted him and asked him to come to Puerto Rico to sign off on loan guaranty documents which would allow him to extend credit to Pinillos for the computers. (DE 267 at pgs. 40, 46-52). He stated that at the meeting at the Espana Bakery, they discussed the subject of the loan for the computers and that there were never any conversations concerning cocaine. (DE 267 at pgs. 54-55). He stated that they were planning to import 100 computers at $1,350 per computer, to be sold in units of 10 for $13,500 a piece, for a total credit of $135,000. (DE 267 at pgs. 55-56).

During Pinillos testimony, Camposano's counsel, Ms. Lydia Lizarribal, did not ask him any questions regarding Camposano's innocence, nor did she attempt to inform the Court that Pinillos was committing perjury based upon the earlier statements he made during the codefendants' meeting where he admitted his guilt and completely exonerated Camposano of any criminal involvement.

### Rodrigo Camposano

Camposano testified that he had a gardening business in Miami (DE 267 at pgs. 89-90) and that Pinillos had asked him, as a favor, to accompany him to Puerto Rico (DE 267 at pg. 91). He stated that he loaned Pinillos $2,000 on July 6th and then came with him to Puerto Rico, where they initially stayed at the Hampton Inn. (DE 267 at pgs. 92-93).

Camposano knew Nolgie Rodriguez-Zamot and knew that he was going to be in Puerto Rico to visit family. He stated that he accompanied Pinillos to the three meetings at the Espana Bakery, the Carolina Shopping Center and Metropol (where the La Ponderosa and Denny's were located), but did not participate in or overhear any conversations about cocaine. (DE 267 at pgs. 95-97). He had $346 in his wallet when he was arrested. (DE 267 at pg. 98).

### Nolgie Rodriguez-Zamot

Noligie Rodriguez-Zamot testified that he knew Camposano, who was one of his customers at his carwash business (DE 267 at pg. 166). He testified that he had come to Puerto Rico to visit with his grandmother, Maria Fernandez Vala, his aunt, Lula Zamot, and other relatives (DE 267 pg. 175). Maria Fernandez Vala, the defendant's grandmother, and his aunt, Polyzarpio Zamot, both testified that he had, in fact, visited them in july of 2001. (DE 267 at pgs. 138-142, 147-149).

Rodriguez-Zamot testified that on July 8th, he met Camposano at the Isle Verde Hampton Inn because Camposano was looking for a room which would be less expensive than the one he had there and that they found him a hotel which was being remodeled, where the price was less expensive. He met Pinillos for the first time that day (DE 267 at pg. 167).

On July 9th, Camposano spoke with Rodriguez-Zamot and invited him to breakfast at Espana Bakery. They met Pinillos, who paid for breakfast there. (DE 267 at pg. 168). While he was talking to Camposano at his table, Pinillos came up and introduced the agent and the two informants to them as some friends of his. (DE 267 at pg. 169). Rodriguez-Zamot testified that he stayed within the bakery for only 20 to 25 seconds and then left with Camposano. He stated that Pinillos and CI Rodriguez followed them outside the restaurant, at which time CI Rodriguez started insisting that they go back inside the restaurant and began questioning him as to whether he was Colombian.

14

When he told CI Rodriguez he was Puerto Rican, CI Rodriguez asked where he lived in Puerto Rico and whether he also lived in the United States. (DE 267 at pgs. 170-172).

Rodriguez-Zamot testified that he had gone out of the bakery because he had not initially gone there to meet with anyone other than Campusano and Pinillos for breakfast, that it didn't seem right to be with so many people and did not want to be a part of their conversation. (DE 267 at pg. 182). He denied participating in any conversation about computers or kilos (DE 267 at pg. 182) and stated that he had left without saying goodbye to anybody. (DE 267 at pg. 173). He also stated that he was arrested around 5:30 pm in the evening and had a return flight at 7:14 pm. (DE 267 at pgs. 173-174).

As pointed out earlier, when Rodriguez-Zamot was arrested, he was not found to be in possession of any significant amount of money. Mark del Valle, who worked in the claims department of Dollar Rent-A-Car, testified that when Rodriguez-Zamot's rental car was returned to Rent-A-Car company, he personally inventoried the car, finding three small bags which contained clothes and gifts, but no money or drugs. (DE 267 at pgs. 151-157).

On October 25, 2002, the jury found all defendants guilty as to both counts of the indictment. (DE 173).

The pre-sentence report computed Camposano's offense level on the basis that the conspiracy involved 100 kilograms of cocaine. This led to base offense level of 36. Camposano objected to the 100 kilogram figure, arguing that the defendants were not capable of purchasing that amount of cocaine because they did not have nearly enough money. The district court disagreed and found the drug offense involved 100 kilograms of cocaine. It therefore applied a base offense level of 36 for each defendant.

Further, for Pinillos and Camposano. the Court then applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, resulting in a total offense level of 38. That total offense level led to a guidelines range of 235-293 months, and the Court sentenced both Pinillos and Camposano to two concurrent terms of 235 months.

For Rodriguez, the Court applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and a two-level enhancement for being a leader or manager under U.S.S.G. § 3B1.1(c), resulting in a total offense level of 40. Combined with his career offender status, that offense level led to a gudielines range of 360 months to life. The Court sentenced Rodriguez-Zamot to two concurrent terms of 360 months.

16

On appeal, the First Circuit Court of Appeals affirmed Camposano's conviction, but vacated and remanded his sentence in light of <u>United States v. Booker</u>, 543 U.S. 220 (2005). <u>See</u> <u>United States v. Pinillos, et al.</u>, 419 F.3d 61 (1st Cir. 2005).

On May 9, 2007, pursuant to the remand, the district Court resentenced Camposano to the same 235 months previously imposed.

On February 13, 2009, the Court of Appeals affrimed the sentence. <u>United States v. Camposano</u>, 556 F.3d 36 (1st Cir. 2009). However, in so doing, the Court of Appeals noted that it was left in doubt as to "how much Camposano was shown to have known" as to the drug quantity. Nonetheless, because Camposano's counsel failed to raise the issue at sentencing or on appeal, it was "not disposed to overturn a sentence on a ground raised neither at sentencing or on appeal." <u>Id.</u> 556 F.3d at 40.

Camposano's petition for writ of certiorari was denied by the United States Supreme Court of June 15, 2009.


## STATEMENT OF INCORPORATION

Camposano incorporates the aforementioned facts in support of each and every ground raised of ineffective assistance of counsel. He also incorporates the facts presented in each ground in support of each other ground as if fully set forth therein. Finally, he raises each ground against every attorney that has re-presented him throughout the proceedings. At trial, sentencing, on appeal, at resentencing and his second direct appeal.

17

I. CAMPOSANO WAS DENIED HIS SIXTH AMENDMENT RIGHT
BASED UPON AN ACTUAL CONFLICT OF INTEREST THAT
ADVERSELY AFFECTED COUNSEL'S PERFORMANCE; AND
BASED UPON PREJUDICIAL INEFFECTIVE ASSISTANCE

(a) **Actual Conflict of Interest**

Because Ms. Lizarribal was a witness to the exculpatory state-
ments made by codefendant Pinillo, and Ms. Plaza argued against a
severance, Ms. Lizarribal's representation of Camposano was burdened
by an actual conflict of interest.

**Joint Defense Agreement**

There is good reason for the law to refrain from imposing on
attorneys a duty of loyalty to their clients' co-defendants. A
duty of loyalty between parties to a joint defense agreement would
create a minefield of potential conflicts. Should any defendant that
enter into such agreement decide to cooperate with the government
and testify in the prosecution's case-in-chief, an attorney for a
non-cooperating defendant would be put in the position of cross-
examining a witness to whom she owed a duty of loyalty on behalf
of her own client, to whom she also would owe a duty of loyalty.
This would create a conflict of interest which would require
withdrawal. See United States v. Moscony, 927 F.2d 742, 750 (3d
Cir. 1991)("Conflicts of interest arise whenever an attorney's
loyalties are divided, and an attorney who cross-examines former
clients inherently encounters divided loyalties.")(citations omitted).
Thus, the existence of a duty of loyalty would require that the
attorneys for **all** noncooperating defendants withdraw from the case
in the event that any **one** participating defendant decided to testify
for the government.

18

"A duty of loyalty would even require withdrawal where a defendant sought to put a defense that in any way conflicted with the defenses of the other defendants participating in a joint defense agreement. An attorney with a duty of loyalty to defendants other than her client could not shift blame to other defendants or introduce any evidence which undercut their defenses. Nor could an attorney cross-examine a defendant who testified on his own behalf." United States v. Stepney, 246 F. Supp. 2d 1069, 1084 (N.D. Cal. 2003).

"As these scenarios illustrate, a joint defense agreement that imposes a duty of loyalty to all members of the joint defense agreement eliminates the utility of employing separate counsel for each defendant and (for purposes of conflict analysis) effectively creates a situation in which all signing defendants are represented jointly by a team of all signing attorneys. The court certainly could not permit joint representation of defendants with such disjointed interests as those in the present case." Id. Stepney at 1084-85.

Because there is an inherent conflict of interests in joint defense agreements, Ms. Lizarribal created an actual conflict of interests by entering into such an agreement. Further, at no time did she explain to Camposano that she was entering into such an agreement with co-counsel and their clients. Nor did she notify the Court. Had Camposano been made aware he would have never waived any conflicts. See United States v. Foster, 469 F.2d 1, 4 (1st Cir. 1972)(during a Foster hearing the Court must explain any potential conflicts and seek a waiver from the defendant). Nor would he have agreed not to present his blame-shifting defense.

Camposano was prejudiced based upon the actual conflict of interest because Ms. Lizarribal was prohibited from using any of the exculpatory statements made by Pinillos to prove Camposano's innocence at trial.

Camposano was prejudiced because Ms. Lizarribal did not move to disqualify herself and testify on Camposano's behalf as to the statements made by Pinillos that inculpated Pinillos and exculpated Camposano. **United States v Kliti**, 156 F.3d 150, 155 (2d Cir. 1998) (hearing necessary where defendant claimed that there was an actual conflict because he had to forgo important testimony by his attorney because of continued representation by that attorney).

Camposano was prejudiced because Ms. Lizarribal allowed Pinillos to perjure himself during trial by claiming his innocence contrary to his earlier statement to her where he admitted his guilt.

Camposano was prejudiced because Ms. Lizarribal did not cross-examine Pinillos about his earlier admission of his guilt. Nor did she question him about the statements he made which exculpated Camposano.

Camposano was prejudiced because Ms. Lizarribal did not pursue a blame-shifting defense as requested by Camposano, which placed the blame on Pinillos. Thus, he lost his right to present a defense.

Camposano was prejudiced because Ms. Lizzaribal made Camposano testify on behalf of his defense, although he did not want to, since she could not elicit the statement of Camposano's innocence from Pinillo.

All of the above was specifically caused based upon the actual conflict of interest.

## (b) **Ineffective Assistance of Counsel**

Assuming there was no joint defense agreement, and thus, no attorney-client privilege between Pinillos and Campusano's attorney, Ms. Lizarribal, Ms. Lizarribal rendered ineffective assistance of counsel which prejudiced Camposano for the same reasons identified above. Since, if she was not constrained by any confidentiality privilege with regards to the statements made by Pinillos (as argued by Ms. Plaza in her motion in opposition to severance), Ms. Lizarribal was required to disqualify herself and serve as a defense witness for Campusano. Keoseian v. von Kaulbach, 707 F. Supp. 150, 154 ("The test for disqualfying counsel is whether counsel 'ought to be called' as a witness)(S.D.N.Y. 1989)(citing ABA Code of Professional responsibility, DR 5-102). See United States v. Kliti, 156 F.3d 150 (2d Cir. 1998).

Not only did Ms. Lizarribal have to disqualify herself because she would be the most critical witness on behalf of Camposano, but also, she would have to disqualify herself because she could not cross-examine or attack Pinillos' credibility without becoming what is referred to as an "unsworn witness." United States v. Gotti, 9 F. Supp. 2d 320, 324 (S.D.N.Y. 1998)

Any attempt by Ms. Lizarribal in failing to bring out the fact that Campusano was innocent would render her performance deficiently prejudicial, which is what ocurred in this case. Worse, was Ms.Lizarribal complete an utter failure in presenting Camposano's blame-shifting defense, which was requested by Camposano and which any other attorney privy to Pinillos' statements would have done.

21

## II.   COUNSEL RENDERED PREJUDICIAL DEFICIENT PERFORMANCE WHEN FILING THE MOTION FOR SEVERANCE AND BY FAILING TO INFORM THE COURT THAT CAMPOSANO COULD NOT BE DENIED HIS CONSTITUTIONAL RIGHTS TO USE PINILLOS'S STATEMENTS

On September 9, 2002, when the district Court denied the joint motion for severance, the Court held that the reason why it was denying the motion was because any incriminating statements made by Pinillos during the meeting held between all three defendants and their attorneys for the stated purpose "to determine a possible common defense for trial" constituted a privileged communication that was inadmissable at trial against Pinillos. And it could not be used by Camposano. (DE:125).

Although the Court did not specify the specific reason why the statements were privileged, an inference can be made that the reason why the Court held those statements were privileged was based upon the joint defense privilege. "The joint defense privilege" is an extension of the attorney client privelege. United States v. Bay State Ambulance, 874 F.2d 20, 28 (1st Cir. 1989)(quoting Waller v. Financial Corp. of America, 828 F.2d 579, 583, n. 7 (9th Cir. 1987)). "The joint defense privilege protects communications between an individual and an attorney for another when the communications are 'part of an on-going and joint effort to set up a common defense strategy. In Re Bevill, Bressler & Schulman Asset Management Corp., 805 F.2d 120, 126 (3d Cir. 1986)(citations omitted). "Communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests." Eisenberg v. Gagnon, 766 F.2d 770, 787-88 (3d Cir.), cert denied, 474 U.S. 946 (1985).

To qualify for the privilege, the communication must have been made in confidence. See United States v. Keplinger, 776 F.2d 678, 701 (7th Cir. 1985), cert. denied 476 U.S. 1183 (1986). Thus, many courts have held that the attorney-client privilege gives rise to a concomitant "joint defense privilege" which "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by their parties and their respective counsel." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). As the Second Circuit observed, "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." Id. at 243-44 (citation and quotation marks omitted).

The attorney-client privilege, however, "is riddled with many exceptions." United States v. Almeida 341 F.3d 1318, 1324 (11th Cir. 2003). Two of which are most relevant here. First, Camposano's unqualified right to present a defense, e.g., blame-shifting defense. Second, Camposano's unqualified right to confrontation. See generally United States v. Grace, 439 F. Supp.2d 1125 (D. Mont. 2006); and Murdoch v. Castro, 365 F.3d 699 (9th Cir. 2004).

In Grace, the district court held that a criminal defendant's right to present a defense trumps a codefendant's invocation of the attorney-client privilege. Id. In so holding, the district court re- lied upon the Ninth Circuit's reasoning in Murdoch. In Murdoch, the Circuit considered a habeas petition presenting a conflict between the attorney-client privilege and a criminal defendant's Sixth Amendment rights in the Confrontation Clause context. Id. at 701.

23

The petitioner in Murdoch was accused of committing a murder during the robbery of a bar. Id. at 701. Several people were involved in the crime, one of whom had already been convicted for his role in the murder and agreed to testify against the petitioner in hopes of receiving a lighter sentence. Id. Without the testimony of the petitioner's alleged accomplice, the government's case against him was weak. Id. The petitioner therefore sought to impeach the testimony of his alleged accomplice by introducing a letter, written by the accomplice to his attorney, in which the accomplice exonerated the petitioner. Id. at 701-702. The trial court refused to admit the letter into evidence or permit the petitioner to cross-examine the accomplice as to its contents. Id at 702.

On appeal, the Ninth Circuit noted that the Supreme Court has not yet addressed a conflict between the Confrontation Clause and the attorney-client privilege, but stated that the Supreme Court's precedents "clearly provide that evidentiary privileges or other state laws must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment." Id. The Murdoch court also noted the Seventh Circuit's statement in United States v. Rainone, 32 F.3d 1203, 1206 (7th Cir. 1994), that "Even the attorney-client privilege ... hallowed as it is, yet not found in the Constitution, might have to yield in a particular case if the right of confrontation ... would be violated by enforcing the privilege." Id. 365 F.3d at 703.

"It would be anomalous to argue that the Sixth Amendment right to defend is limited to challenging the government's case by confrontation and cross-examination of witnesses but does not extend to

presenting exculpatory proof that could provide a defense to one or more counts of the indictment." <u>Grace</u>, 439 F.Supp.2d at 1142.

Consequently, because Pinillos could not invoke the attorney-client privilege to the statements he made exonerating Camposano, Ms. Lizarribal rendered prejudicially deficient performance in failing to object to the denial of the motion to sever the trials. As well as, prejudicial deficient performance because notwithstanding that Pinillos would no longer incriminate himself in favor of Camposano, and therefore, no longer a need for severance, Ms. Lizarribal needed to explain to the court (and object) that the Court could not order that Pinillos incriminating statements be inadmissable at trial against Pinillos and used in favor of her client (Camposano). <u>See</u> <u>United States v. Henke</u>, 222 F.3d 633, 638 (9th Cir. 2000)(where the attorneys "told the district court that this was not a situation where they could avoid reliance on the privileged information and still fully uphold their ethical duty to represent their clients.").

And, contrary to Pinillos's attorney, Ms. Plaza, Ms. Lizarribal could not be kept from using those incriminating statements against Pinillos at trial where he now planned (and did) commit perjury by claiming that he was innocent. Mr. Pinillos's testimony at trial that he was innocent was nothing more than a fruad upon the court that in no way helped Camposano. The difference between Pinillos stating he was guilty and Camposano innocent, as opposed to Pinillos claiming at trial that he was innocent cannot be measured.

To even argue, as Ms. Plaza did in her motion in opposition for severance, that there was no difference is insulting, to say the least.

**Waiver of attorney-client privilege.**

And yet another reason why Ms. Lizarribal rendered prejudicial deficient performance in this context was because by the time the district court was considering the motion for severance, Pinillos statements were no longer protected by the attorney-client privilege. Both, Ms. Lizarribal and Ms. Plaza had filed motions in open court stating that Pinillos stated "CAMPOSANO AND RODRIGUEZ-SAMO did not have anything to do with the charges filed against them." See Joint Motion Requesting Severance (DE:112) at 2, ¶ 8. "Mr. Pinillos further asserted that Messrs. CAMPOSANO and RODRIGUEZ-SAMO where totally innocent." Id. at 2, ¶ 9. Also see: "the codefendants assert in their motion that defendant Pinillos made an alleged incriminating statement stating that both co-defendant had nothing to do with the charges against them..." Ms. Plaza's Motion In Opposition To Severance And To Exclude defendant's Alleged Statements Made During Co-Defendant's Meeting," at 1.

In fact, at a status conference Ms. Plaza stated in open court that "Ms. Lydia Lizarribar told her that Jaime Pinillos spoke to her and not only exculpated the other two defendants but inculpated himself." See May 16, 2002, court notification resetting status conference for May 29, 2002. And, on May 29, 2002, Ms. Lizarribal restated in open court during the status conference what she had stated to Ms. Plaza above.

Confronted with this information, the Court ordered the parties to submit any motion for severance, opposition and Government's response under seal. See May 30, 2002, court notification to parties.

However, Ms. Lizarribal as well as Ms. Plaza failed to follow the Court's order, and instead, filed their respective motions for severance and opposition once again in open court, and not under seal as ordered. (DE:112 and DE:122). Consequently, whatever privilege Piniilos's statements might once have had certainly by this juncture it had been deemed waived by both attorneys. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985)(noting that waiver of the privilege can "be undertaken by individuals empowered to act").

As such, because Pinillos had necessarily waived the attorney-client privilege when his attorney (Ms. Plaza) and Ms. Lizarribal had stated in open court, and in the presence of the Government, what Pinillos had stated, Ms. Lizarribal rendered prejudicial deficient performance in failing to claim in support of severance, or, alternatively, in support of using those statements at trial if the Court denied the severance, that Pinillos could not invoke the attorney-client privilege because it was deemed waived.

WHEREFORE for all the foregoing reasons, Camposano is entitled to have his conviction and sentence vacated.

III.   COUNSEL RENDERED PREJUDICIAL DEFICIENT PERFORMANCE
       FOR FAILING TO SPECIFY THE REASONS WHY AN INVESTI-
(a)    GATOR WAS CRITICALLY ESSENTIAL IN CAMPOSANO'S CASE;
       AND FOR FAILING TO PREPARE A DEFENSE

Prior to trial, Ms. Lizarribar filed an exparte motion for
authorization to retain a private investigator for approximately
40 hours because an investigation was necessary for trial prepa-
ration based upon information that Camposano had provided to
her about the facts of the case, and other information that became
available in the course of the proceedings. Among the reasons why
an investigator was needed, specifically, Camposano had provided
the names of the witnesses he needed Ms. Lizarribar to call in
support of his defense. (DE 97 and 132).

For example, Camposano requested that Ms. Lizarribar call
as a witness his common law wife, Isabel Cristina Osorno and his
son's mother, Luz Stella Zabala, both of whom would testify that
Camposano had informed them that he was traveling to Puerto Rico
on vacation with Pinillos. That Pinillos was going to pay for the
trip because Camposano was loaning him the money ($2,000) so he
can buy computers. And that the money would be returned as soon
as they came back and he sold the computers.

Further, Ms. Osorno would testify that she personally heard
Pinillos state this to Camposano, because the money that Camposano
was going to lend him was the money that Camposano and Ms. Osorno
had set aside to pay the mortgage of the apartment and their
monthly living expenses, including the expense for his gardening
business.

28

Additionally, Camposano requested that Ms. Lizarribar have the investigator pull the documents from his corporation, RC and AG Service to show that he had always paid his taxes and was up to date with the State of Florida. As well as the records of his bank accounts at Ocean Bank and Washington Mutual, which would show the withdrawal of monies used to loan to Pinillos.

Camposano also informed Ms. Lizarribar that she could get his mortage statement which showed that he purchased his apartment at 2075 S.W. 122 Avenue (#518), Miami, FL 33175, with a government funded loan. And that he was make car payments on a car. This would show that the money loaned to Pinillo was the amount the corresponded with his bills.

Camposano also requested that Ms. Lizarribar call as a witness his employee at his gardening business because he had left him in charge for those days while he was on vacation. And that his employee was the only person he talk to on the cell phone which Pinillos had purchased.

An investigator was also needed to get proof of the phone calls made from the hotel, which would show that Camposano called his common law wife from the room and that no other calls were made. An investigator was needed to interview all these witnesses. And to get  the documentation from the airlines to show that Camposano's departure was scheduled for the same day he was arrested. Further, Camposano wanted Ms. Lizarribar to get the camera which he used to take picture and have the investigator develop them to show that he was on vacation. Finally, Camposano had asked that Ms. Lizarribal call character witnesses for him, since he was a hard worker with no prior criminal history.

Notwithstanding the above, Ms. Lizarribar did not secure an investigator, although she informed the Court that a more detailed proffer could be made to the Court ex parte as not to jeopardize the defense, the Court denied her motion. And denied her subsequent motion for reconsideration as well.

Ms. Lizarribar informed the Court that the denial of authorization to retain an investigator had seriously affected the defense of Camposano, and she could not prepare for trial nor locate the witnesses and evidence necessary.

Precisely for the above reasons, Ms. Lizarribar rendered ineffective assistance of counsel. And she admitted as much in her motion requesting an investigator and the request for reconsideration, both of which were denied by the trial court.

As the Third Circuit stated in United States v. Gray, 878 F.2d 702 (3d Cir. 1989), "Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a line of investigation when s/he has not yet obtained the facts on which such a decision could be made." Id. 878 F.2d at 711.

Based upon the foregoing, Camposano is entitled to have his conviction and sentence vacated. And a new trial should be granted.

(b) CAMPUSANO WAS CONSTRUCTIVELY DENIED COUNSEL BY THE COURT'S DENIAL OF HIS ATTORNEY'S MOTIONS FOR AN INVESTIGATOR; IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT UNDER CRONIC AND FIFTH AMENDMENT RIGHT

The trial court's denial of Ms. Lizarribar's motions for an investigator (DE 97 and 132) actually and/or constructively denied Campusano counsel, United States v. Cronic, 466 U.S. 648 (1984), and violated his due process rights. Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1994).

IV. CAMPOSANO'S DUE PROCESS RIGHTS WERE VIOLATED
BY THE GOVERNMENT'S OUTRAGEOUS MISCONDUCT IN
MISLEADING DEFENSE AND THE COURT ABOUT THE
CONFIDENTIAL INFORMANTS AUTHORIZATION TO ACT
AS AUTHORIZED INFORMANTS FOR THE DEA; ALL IN
VIOLATION OF BRADY, GIGLIO, KYLES, AND NAPUE

Prior to trial, Camposano's attorney, Lydia Lizarribar filed and joined in  a  comprehensive motion requesting all exculpatory and impeachment evidence in possession of the Government. More importantly, a full disclosure of all information pertaining to the Government's confidential informants, Nelson Rodriguez and Nataya Posada. The Government did not provide any information on the CIs until well into the trial, and even then it was only a partial response relating to the tax returns filed by CI Rodriguez. See tr. trans. pg. 88 (10/21/02)(DE 265)(Ms. Plaza: "Thank you, Your Honor. I received this morning a package part of the discovery documents that were requested regarding the witness/informant, and it is related to tax returns.").

Critical to Ms. Lizarribar's cross-examination of CI Rodriguez, was whether he was an authorized DEA confidential informant and whether he was authorized to make recordings of phone conversations at the time of the investigation of this case. CI Rodriguez answered affirmatively. And AUSA Feldman supported his testimony by advising defense and the Court that CI Rodriguez had signed in Puerto Rico a DEA Form 473 (on August 1998) that gave him a lifetime agreement to act as an informant and be authorized to make recordings. (TT. pg. 111 (10/22/02)(DE 266). See also DE 266 at 55-56.

AUSA Feldman's response was made after the Court had ordered
the Government "to find out if [the confidential informant] had in
force an agreement with the DEA as an informant on July the 5th,
2001 to July 11th, 2001." (DE 266 at 88). But even though AUSA
Feldman stated to the Court that CI Rodriguez was authorized, her
statement was false because CI Rodriguez had not signed the revised
DEA-473 Form, which only lasted for one year, after he had signed
the expired August 1998 form. It becamse a standardized (mandatory)
practice while Janet Reno was Attorney General to have every CI
sign a "Confidential Source Agreement" on a yearly basis. If this
was not done, it was based upon the deactivation of the CI.

Consequently, AUSA Feldman improperly vouched for both CIs
and falsely stated to the Court that CI Rodriguez was authorized
in July 2001 to act as a confidential informant. Worse, AUSA Feldman
never produced the DEA 6 that showed the CI's deactivation. And thus,
Camposano's attorney could not impeach the CI or the Government's
entire investigation. See United States v. Blanco, 392 F.3d 382
(9th Cir. 2004).

Additionally, the Government failed to provide any documentation
regarding the other CI, Nataya Posada, or her status as a DEA CI.
And the Government did not reveal that CI Posada had been provided
a "visa" to travel to the United States in return for her cooperation.
Ms. Lizarribar had requested as part of her discovery motion a full
and complete statement of all promises, considerations, rewards, or
inducements, made by the Government. But the Government withheld this
information as well, all in violation of Campusano's confrontation
and due process rights, and all in violation of Brady, Giglio, Kyles
and Napue. Camposano is entitled to a new trial.

## V. COUNSEL RENDERED PREJUDICIAL DEFICIENT PERFORMANCE IN FAILING TO ADVISE CAMPOSANO TO ACCEPT THE GOVERNMENT'S PLEA OFFER OF 48 MONTHS'; IN FAILING TO ADVISE CAMPOSANO OF THE GOVERNMENT'S SUBSEQUENT PLEA OFFER; IN FAILING TO ADVISE CAMPOSANO THAT HE COULD MAKE ANY COUNTEROFFERS; AND IN FAILING TO ADVISE CAMPOSANO THAT HE COULD RECEIVE A POSSIBLE SENTENCE REDUCTION IF HE COOPERATED

On Septemeber 20, 2002, the Government made a final offer to Camposano of 48 months' imprisonment if he agreed to plead guilty. See **EXHIBIT 1.** At the time of the Government's offer, Camposano had already been incarcerated 15 months since his arrest (on June 24, 2001). Meaning, Camposano would only have a remaining 33 months to serve if he accepted the Government's offer. In fact, deducting the 15% good time credit he would have received from the Bureau of Prison, at the most Camposano had no more than 27 months left to be served.

Instead, based upon Ms. Lizarribal's affirmative misadvice that if convicted after a jury trial Camposano could only receive a sentence between 78 to 97 months (BOL 28), Camposano decided not to accept the Government's offer. At no time did Ms. Lizarribal advice Camposano that it was in his best interest to accept the Government's offer. Had counsel advised Camposano that it was in his best interest to accept the Government's offer, Camposano, whom had contemplated accepting the offer, would have agreed to plead guilty.

Worse, Ms. Lizarribal never advised Camposano that the Government had made any subsequent plea offers which provided for less time, nor did she ever advise Camposano that he could make a counteroffer(s) to the Government's plea agreement, id. EXHIBIT 1. Thus, Ms. Lizarribal failed to enter into plea negotiations as required by Camposano's Sixth Amendment right to effective assistance.

33

Most significantly, Ms. Lizarribal failed to advise Camposano that he could negotiate with the Government to allow him to plead guilty to the 48 months and allow him to cooperate against Pinillos at trial and possibly receive a sentence reduction. Had Ms. Lizarribal advised camposano of such a possibility, he would have immediately pled guilty since he was already contemplating pleading guilty even without knowing that a possible reduction was available.[*]

WHEREFORE for the foregoing reasons, Ms. Lizarribal rendered prejudicial deficient performance, and Camposano's conviction and sentence should be vacated and he should be allowed to plead anew.

---

[*]   As will be noted infra, Camposano believes that Ms. Lizarribal failed to advise him of the option of cooperating against codefendant Pinillos based upon the district court's order directing the parties not to use any incriminat-statements made by Pinillo at the codefendants meeting.

## VI.   COUNSEL RENDERED PREJUDICIAL DEFICIENT PERFORMANCE FOR AFFIRMATIVELY MISADVISING CAMPOSANO AS TO HIS SENTENCING EXPOSURE IF HE REJECTED THE PLEA OFFER

At the time the Government made its plea offer of 48 months, and Camposano was contemplating accepting the Government's offer, Camposano asked Ms. Lizarribal what would be his sentencing exposure if he rejected the Government's offer of 48 months. Ms. Lizarribal stated, in no uncertain terms, that instead of a total adjusted offense level of 23 as stated in the Government's offer, see EXHIBIT 1, Camposano would be at an adjusted offense level of 28.

Specifically, the difference between an offense level of 23, CHC I (46 to 57 months), and offense level of 28 (78 to 97 months), was about 3 years difference, give and take a few months depending on whether the Court would sentence Camposano in the lower end or higher end of the guidelines. Based on this erroneous advice was the reason why Camposano decided to proceed to trial and not accept the Government's plea offer.

But contrary to Ms. Lizarribal's sentence calculation, after Camposano was found guilty by the jury the probation officer calculated his adjusted offense level at 36, plus two points enhancement for obstruction of justice, placing Camposano at a level 38. Had Camposano not been affirmatively misadvised by Ms. Lizarribal as to his sentencing exposure if he proceeded to trial and was found guilty, Camposano would have pled guilty and accepted the Government's 48 months plea offer.

35

## VII.  COUNSEL RENDERED PREJUDICIAL DEFICIENT PERFORMANCE PRIOR TO TRIAL IN FAILING TO ADVISE CAMPOSANO ABOUT HIS CODEFENDANT RODRIGUEZ-SAMO'S PRIOR DRUG CONVICTIONS

Prior to trial, when Camposano was contemplating pleading guilty based upon the Government's 48 months plea offer, he specifically asked counsel (Ms. Lizarribal) about what did she think were his chances at trial. Ms. Lizarribal said that his chances were very good in light of the fact that there was no direct evidence linking him or Nolgie Rodriguez-Samo to the drug charges. And that Rodriguez-Samo was going to testify that he knew nothing about a supposed drug transaction taking place and the only reason why he was in Puerto Rico was because he was visiting family, and had met Camposano there only because Camposano was looking for a hotel room which would be less expensive than the one he had at the Isla Verde Hampton Inn.[*]

However, what Ms. Lizarribal failed to inform Camposano was that prior to trial, just before the jury selection process began, the prosecutor in this case filed an information under 21 U.S.C. § 851(a)(1) against Rodriguez-Samo, which notified the Court that Rodriguez-Samo had several prior drug convictions totaling more than a hundred kilograms of coaine and heroin, and thus, he was subject to an enhanced sentence of life imprisonment.

In filing the 851 notice, the prosecutor explained to the Court that it had not filed the information sooner because it was ensuing guilty plea negotiations right up to the eve of trial. But while the prosecutor explained the above to the Court, Ms. Lizarribal did not inform Campusano about Rodriguez-Samo's drug priors and that they would be introduced against him at trial.

---

[*] Further, as seen supra, Ms. Lizarribal also erroneously advisedCamposano that he had a valid and meritorious defense, contrary to law. See Claim IV.

Had Camposano been made aware by Ms. Lizarribal about how the Government would be able to introduce Rodriguez-Samo's prior drug convictions at trial, he would have never agreed to proceed to trial and would have immediately plead guilty without any hesitation whatsoever. At trial, Camposano would testify that he had a gardening business in Miami and that Pinillos had asked him, as a favor, to accompany him to Puerto Rico. He stated that he loaned Pinillos $2,000 on July 6th and then came with him to Puerto Rico, where they initially stayed at the Hampton Inn. (DE:267, at pgs. 89-93). Camposano would also testify that he knew Nolgie Rodriguez-Samo. Id.

Camposano would not have gone to trial where he would be associated with a convicted felon (Rodriguez-Samo), who had been convicted for prior drug trafficking. Basically, the same charges he was now being asked to defend against. It would be highly improbable to think that a jury would believe Rodriguez-Samo's testimony that the only reason why he was in Puerto Rico was because he was visiting his relatives when the Government would be introducing evidence showing the contrary, and supporting said evidence with his prior drug convictions.

Up to the eve of trial, Camposano was contemplating pleading guilty. Had Ms. Lizarribal simply explained to Camposano about Rodriguez-Samo's prior drug convictions and that they would be introduced at trial against Rodriguez-Samo, whom was charged with Camposano as a coconspirator, Camposano would never have gone to trial and allowed himself to be associated with a convicted felon. Camposano, who had no prior criminal history whatsoever, would have pled guilty.

37

VIII.   CAMPOSANO WAS DENIED HIS SIXTH AMENDMENT RIGHT
        TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS
        COUNSEL NEVER PROVIDED HIM WITH THE RECORDING
        OR TRANSCRIPTS OF GOVERNMENT CASETTE N-2

At all times prior to trial there was great confusion as to what audio recording tapes the Government would use at trial. Many objections were filed. And the Government ultimately agreed not to use many tapes because they could not be understood. Yet, at no time during the pretrial proceeding was Camposano provided with audio casette N-2, or any transcripts made of such a recording. It appears that this tape was never made available to anyone on the defense, although in one of the Government's responses to the standing discovery order it appears that the Government had turned it over. Yet, this appears to be incorrect insofar as the tapes were mislabeled. At this juncture, it looks like whatever tape was provided as N-2 was actually a fabricated, altered, or edited tape.

Regardless, however, during trial an alleged recording surfaced and was introduced by the Government as Exhibit N-2. Camposano was surprised by this recording because he had never seen or heard it prior to trial. Had Camposano known of this actual recording, he would have never proceeded to trial. Since at all times his attorney had stated that no recording identified as N-2 existed. In fact, codefendant Jaime Pinillos's attorney, Ms. Joanna Plaza, had transcribed all audio tapes identified as Government's Exhibits N-1 through N-7 and audiotape N-2 was blank.

Building a defense strategy on partial, incorrect or incomplete audio tapes does not suffice the treshold requirement of due process of law. See United States v. Noe, 821 F.2d 604, 609 (11th Cir. 1987). As such, neither could      Camposano's defense counsel, Ms. Lydia Lizarribal, provide  competent advice as to whether or not proceeding to trial would be in Camposano's best interest without fully knowing what evidence existed, if any, in audio recording N-2.

Audio recording N-2, according to Ms. Lizarribal, contained nothing. It was blank. At trial, however, it was central to the Government's case and was no longer blank. Ms. Lizzaribal provided prejudicial deficient performance by failing to object to this 11th hour apparition of this recording. And provided prejudicial deficient performance when advising Camposano that this tape was blank. Had Camposano been correctly advised, he would not have proceeded to trial because the Government's case benefitted by the use of this recording.

39

## IX. COUNSEL RENDERED PREJUDICIAL DEFICIENT PERFORMANCE FOR FAILING TO ADVISE CAMPOSANO THAT IF HE TESTIFIED AT TRIAL AND WAS FOUND GUILTY HIS SENTENCE COULD BE ENHANCED TWO POINTS FOR OBSTRUCTION OF JUSTICE

Ms. Lizarribal never advised Camposano that if he testified at trial and, notwithstanding, was found guilty by the jury his sentence could be enhance two points based upon obstruction of justice. Camposano never wanted to testify on his behalf. At all times he requested Ms. Lizarribal to present the statements given by Pinillos attesting to his innocence. And, if she was not allowed, to present other evidence to contest the Government's case.

Ms. Lizarribal advised Camposano that because she could not use Pinillos's statements exonerating him, and because the Court had denied her motions for an investigator, there was no other way to refute the Government's case unless Camposano took the stand and testified on his behalf. At no time did Ms. Lizarribal advise Camposano that he had any options other than testifying, much less did she advise Camposano that she could simply rest after the Government presented its case and simply challenge the sufficiency of the evidence.

Most importantly, Ms. Lizarribal failed to apprise Campusano that if he testified and was nonetheless found guilty, the Court could enhance his sentence by any number of years based upon obstruction of justice. Had Camposano been advised of the mere possibility of such an enhancement, he would never have testified on his behalf. Consequently, Camposano is entitled to a two point reduction in his sentence.

### X.   COUNSEL RENDERED PREJUDICIAL DEFICIENT PERFORMANCE BY ADVISING CAMPOSANO THAT HE HAD A MERITORIOUS DEFENSE, WHICH LED CAMPOSANO TO REJECT THE GOVERNMENT'S PLEA OFFER

At the time Camposano was contemplating accepting the plea offer of 48 months' imprisonment, he asked Ms. Lizarribar about what defense she planned to introduce at trial and defend him with. Ms. Lizarribar stated that apart from arguing that there was insufficient evidence to find Camposano guilty. She was also going to prove that Camposano did not conspire because a defendant can not conspire with a government agent. Based on Ms. Lizarribar's stated defenses, Camposano decided to reject the Government's offer and proceed to trial.

At trial, however, when Ms. Lizarribar requested that the Court give an instruction that a defendant cannot conspire with a government agent, the Court denied the request. (T.T. 10/24/02 p. 86). The Court based its finding on its analysis of the applicable case law on the matter of conspiring with a government agent. The Court asserted that said instruction only applies when it is solely the defendant an a government agent together, because a defendant can not conspire alone. (T.T. 10/24/02 p. 86). The Court determined that although there were government informants in this case as well as a government agent, there were also additional defendants, therefore making the instruction unnecessary and inapplicable (id.). See United States v. Portela, 167 F.3d 687 (1st Cir. 1999).

Precisely for this reason, Ms. Lizarribar rendered prejudicial deficient performance. She did not know the law and had erroneously advised Camposano as to the availability of this defense, without which he would not have gone to trial or rejected the Government's plea offer.

41

XI.    APPELLATE COUNSEL RENDERED PREJUDICIAL
       DEFICIENT PERFORMANCE ON APPEAL

On appeal, appellate counsel failed to raise the most critical issue——which had been preserved by Ms. Lizarribal during the district court proceedings.

To wit, the district court's denial of Ms. Lizarribal's motion requesting funds to retain an investigator and motion for reconsideration of the district court's order denying an investigator. As Ms. Lizarribal stated, "The investigation is necessary for trial preparation and the information recently became known."  Without authorization to retain an investigator, Ms. Lizarribal stated, it had seriously "affected the defense of Mr. Camposano."  See Exparte Request For Authorization To Retain Investigator at 1 ¶ 5; and Request For Reconsideration of Court's Order Denying Investigator at 1 ¶ 4-5.

Because the district court denied both these motions, Ms. Lizarribal could not conduct any pretrial investigation, nor locate any witnesses and evidence necessary to competently represent her client (Camposano) at trial. Much less, competently provide any advice whether or not Camposano should proceed to trial or plead guilty.

As the Third Circuit stated in **United States v. Gray**, 878 F.2d 702, 711 (3d Cir. 1989):

> Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a line of investigation when s/he has not yet obtained the facts on which such a decision could be made.

Id.

Precisely because the district court denied the motions for authorization to hire an investigator, rendering any assistance provided by Ms. Lizarribal prejudicially deficient, the district court abused its discretion. Had appellate counsel raised this dead-bang winning issue on appeal, the First Circuit would have automatically vacated Camposano's conviction since it has been clearly recognized that an attorney cannot provide competent representation of an accused when counsel has failed to conduct any meaningful investigation. Id. Gray.

When counsel fails to conduct any pretrial investigation, courts of appeals generally find this failure constitutes a clear instance of ineffectiveness. See Sullivan v. Fairman, 819 F.2d 1382 (7th Cir. 1987)(counsel's cursory attempts to locate witness ineffective); Code v. Montgomery, 799 F.2d 1481 (11th Cir. 1986)(counsel interviewing only one witness was unreasonable); Crisp v. Duckworth, 743 F.2d 580 (7th Cir. 1984)(since attorney must investigate case in order to provide minimally competent representation, **it will be unusual case where complete lack of investigation is not unreasonable**); Thomas v. Lockhart, 738 F.2d 304 (8th Cir. 1984)(investigation that solely involved reviewing the prosecutor's file falls short of what reasonable attorney would have done).

Significantly, here, we already know that Ms. Lizarribal knew that she needed an investigator precisely to provide Camposano with competent representation. She repeatedly informed the Court that she needed an investigator and "[t]he denial of authorization to retain an investigator ha[d] seriously affected the defense of Mr. Camposano." Motion for Reconsideration at 1 ¶ 4.

As such, appellate counsel dropped the ball by failing to raise this critical and preserved issue on appeal.

In addition to the above issue, appellate counsel also rendered ineffective assistance for failing to raise yet another preserved issue, to wit, the denial of Camposano's motion to dismiss the indictment based upon perjured testimony before the grand jury, which not only substantially influenced its decision to indict Camposano, without which perjury he would not have been indicted, but also, completely vitiated the independence of the Grand Jury's decision to indict. United States v. Martinez, 710 F. Supp. 415 (Dist. of Puerto Rico 1989).

Ms. Lizarribar had filed a motion prior to trial to join co-defendant Nolgie-Rodriguez's motion to dismiss for perjured testimony before the grand jury [DE 101]. (DE 110). On May 22, 2002, the Court ordered the Government to respond by no later than June 10, 2002. The Government, however, requested an extension of time until June 28, 2002 to respond to defendants' motion. But even before the Court ruled on the Government's extension, the Court entered an order on June 12, 2002, denying the motion to dismiss (DE 114). The Court denied the motion summarily without an explanation and made no findings of fact or law. Said order was reversible per se.

Without question, the Government presented perjured testimony before the Grand Jury. And such perjury was presented knowingly through DEA Agent Juan Berrios, who was the only witness that went before the grand jury. Without this testimony Camposano would not have been indicted. As such, appellate counsel rendered prejudicial performance in not raising this preserved issue on appeal.

44

XII.   COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT
       SENTENCING FOR FAILING TO ARGUE CAMPOSANO'S
       LACK OF KNOWLEDGE AS TO THE QUANTITY OF DRUGS

On appeal, the First Circuit Court of Appeals held that it
was left uncertain as to the amounts of drugs that should be
attributed to Camposano. United States v. Camposano, 556 F.3d 36,
39-40 (1st Cir. 2009)("We have reviewed the testimony and pre-
sentence report with some care and are left uncertain how much
Camposano was shown to have known; but we are not disposed to
overturn a sentence on a ground raised neither at sentencing or
on appeal.").

Precisely for this reason, both sentencing counsel and appel-
late counsel were ineffective for failing to raise this issue. If
raised, Camposano's sentence would have been vacated on his re-
sentencing and he would have only been sentenced based upon the
one kilo transaction.

Consequently, Camposano is entitled to have his sentence
vacated and be resentenced based only upon a one kilo transaction.

XIII.   COUNSEL ALSO RENDERED INEFFECTIVE ASSISTANCE
        AT SENTENCING FOR FAILING TO SHOW THAT WHATEVER
        THEIR COMMITMENT, DEFENDANTS LACKED THE RESOURCES
        TO PURCHASE THE AGREED UPON AMOUNT AND THAT THE
        TRANSACTION COULD NOT HAVE BEEN ACCOMPLISHED

At the time Camposano showed up at the supposed drug tran-
saction he arrived on foot and with no money. Pinillo's also had
no money because it was Pinillos who had borrowed $2,000.00 from
Camposano just to pay for the expenses associated with the trip to
Puerto Rico. Finally, Nolgie-Rodriguez also had no money to pay for
any drugs. As such, counsel rendered ineffective assistance for fail-
ing to prove that the transaction could not have been accomplished.

45

## EVIDENTIARY HEARING

Because most of Camposano's claims are based on matters that are outised of the record, an evidentiary hearing is required to resolve his ineffective assistance of counsel claims. See Tejeda v. Dugger, 941 F.2d 1551 (11th Cir. 1991); Holmes v. United States, 876 F.2d 1545 (11th Cir. 1989); Vick v. United States, 730 F.2d 707 (11th Cir. 1984); and Machibroda v. United States, 368 U.S. 487 (1962).

## CONCLUSION

WHEREFORE for the foregoing reasons, Camposano respectfully moves this Honorable Court to vacate, set aside, and/or correct his conviction and sentence. And any other relief this Court deems just and proper.

I Declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of April, 2010.

Rodrigo Camposano.
Rodrigo Camposano
Reg.No.: 22204-069
FCC Coleman LOW (B-1)
P.O. Box 1031
Coleman, FL 33521-1031



USA FIRST-CLASS FOREVER

CERTIFIED MAIL

7005 0390 0000 8154 1885

RETURNED FOR POSTAGE
STAMPS ARE VOID WHEN DEFACED,
REUSED, COVERED WITH TAPE,
OR STACKED

CLERK"S OFFICE
UNITED STATES DISTRICT COURT
Room 150 Federal Bldg.
San Juan, Puerto Rico 00918-1767

U.S. POSTAGE
PAID
COLEMAN, FL
APR 3321
APR 29 10
AMOUNT
$0.00
00006073-07

2204-069

RODRIGO CAMPUZANO
Federal Correctional
Complex -B1
Coleman, FL - 33521 - 1031
United States

RETURN RECEIPT
REQUESTED